Submitted on record and brief March 10, reversed and remanded July 6, 1983

## MERCER,
*Petitioner,*

*v.*

## EMPLOYMENT DIVISION et al,
*Respondents.*

(82-AB1341; CA A25528)

665 P2d 1259

Michelle P. Mercer, Oceano, California, filed the brief pro se for petitioner.

Michael D. Reynolds, Assistant Attorney General, Salem, waived appearance for respondent Employment Division.

No appearance for respondent Good Samaritan Hospital.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

This is an unemployment compensation case. Petitioner, a registered nurse who was employed by respondent Good Samaritan Hospital (the employer) as a staff development specialist, was advised that, due to budget cuts, she would be required to devote a portion of her time to doing clinical work and direct patient care. She resigned, claiming that she is so allergic to the sterile and non-sterile gloves worn in staff nursing that she cannot do clinical work. Her subsequent claim for unemployment compensation benefits was approved by both an administrative decision and, after a hearing, a referee's decision. However, on further review, the Employment Appeals Board (EAB) held (one member dissenting) that petitioner had voluntarily left work without good cause. This petition for judicial review followed. We reverse and remand.

A person who voluntarily leaves work may nonetheless immediately qualify for unemployment compensation benefits if the person left for "good cause." ORS 657.176(2)(c). OAR 471-30-038(4) provides:

> "Good cause for voluntarily leaving work under ORS 657.176(2)(c) is such that a reasonable and prudent person of normal sensitivity, exercising ordinary common sense, would leave work. The reason must be of such gravity that the individual has no reasonable alternative but to leave work."

The referee found the pertinent facts to be:

> "* * * (2) [Petitioner] left work because budget cuts required her to perform staff nurse duty in addition to her other duties. (3) [Petitioner] was highly allergic to the sterile and unsterile gloves she was required to wear while working as a staff nurse. (4) Employer anticipated [petitioner] would work two to three days per month as a staff nurse, however the March 1, 1982 schedule provided that she and another person split nine duty days that month. * * * (6) One type of glove caused claimant less reaction than others, however the reaction was a major allergic reaction. (7) It was not practical for employer to allow [petitioner] to work only the [new] development specialist hours and [petitioner] would not consider reduced hours. (8) There were no other positions with employer available for claimant at the time she left work. * * *"

As noted, the referee concluded from the foregoing that claimant left work for good cause.

EAB, reviewing the record at the employer's request, saw the situation differently:

"* * * (3) It was anticipated that [petitioner] would be assigned to working a total of three days per month as a staff nurse. (4) This work required the wearing of surgical type gloves. (5) The [petitioner] was allergic to sterile and unsterile gloves used in her profession. (6) *Her allergy was aggravated by wearing such gloves over a long period of time.* (7) *There was one type of glove the [petitioner] could have worn that did not cause a severe reaction.* (8) The employer would have purchased the type of gloves needed by the [petitioner] because of her allergy. * * *" (Emphasis supplied.)

Having found the foregoing, EAB held, in pertinent part:

"We do not agree with the referee that good cause for leaving work has been established. Only a minimal amount of the [petitioner's] time would have been devoted to working as a staff nurse. There was a type of glove she could wear which did not cause a severe reaction and the employer was willing to purchase this type of glove for the claimant. Her leaving work in anticipation of being used more than three days per month as a staff nurse and anticipating she would be subjected to an allergic reaction because of gloves needed [while] performing that work, does not support a finding of good cause for leaving. She has not shown that anticipation of what might occur was of such gravity that no reasonable alternative was left except leaving work. She could have tried the gloves that did not produce a severe reaction to her allergy. * * *"

As petitioner argues in her brief, EAB's findings and conclusions—especially findings (6) and (7)—misstate the evidence. Petitioner's testimony, which is the only evidence on the subject and which EAB apparently accepted as truthful, shows that, even using the special gloves and for relatively short periods of time, her allergic reaction is very significant:

"* * * When I talk about the brown-milled gloves causing minimal problems in relationship to the other types of gloves, minimal problems means that they do swell and they do crack and they are uncomfortable and the only way that I can use the brown-mills is also to use cortisone cream which is not—it's not very good to use cortisone cream. It's not real healthy anyway to—you know, to use that. * * *"

Petitioner also explained, concerning the brown-mill glove:

"* * * I do have—there was one glove that—a brown-milled glove that I only reacted to not—well, I didn't react severely to but I did react to and I possibly could've worn that glove but * * * I also do still react to that, it's just not quite as bad but the dermatologist told me that I would probably, if I wore that one very much, would develop a more severe allergy to it, too."

In substance, then, petitioner's testimony was that even minimal use of the brown-mill glove would result in immediate allergic reaction that would be both unsightly and painful; continued use would likely exacerbate her reaction until the allergic condition would require drastic medical intervention; even the present medication she is forced to use is undesirable over a long period; and the more drastic approach—steroids—is one she is unwilling to face again. If, as we surmise, EAB accepted petitioner's testimony as credible, then its findings, especially findings (6) and (7), misstate the facts. If the Board is *rejecting* some of petitioner's testimony, it has not said so and, inasmuch as petitioner was the only one to testify concerning her condition, findings at odds with her testimony are, by definition, not supported by substantial evidence.

Because the EAB order suffers from the defects just described, it must be reversed and remanded for reconsideration in the light of this opinion. *See, e.g., Bremer v. Employment Division,* 47 Or App 1131, 615 P2d 1170 (1980).

Reversed and remanded for reconsideration.